**FLORISTS' NATIONWIDE TELEPHONE DELIVERY NETWORK—AMERICA'S PHONE-ORDER FLORISTS, INC., Plaintiff-Appellant, (Appellee in No. 15720)**

v.

**FLORISTS' TELEGRAPH DELIVERY ASSOCIATION, a corporation, Defendant-Appellee, (Appellant in No. 15720).**

**Nos. 15719, 15720.**

United States Court of Appeals
Seventh Circuit.

Jan. 3, 1967.

---

Francis J. McConnell, Thomas C. McConnell, John Borst, Jr., Lowell N. Elsen, Chicago, Ill., for Florists' Nationwide Telephone.

Melville C. Williams, William A. Carey, Chicago, Ill., Arnold & Porter, Washington, D. C., Dickinson, Wright, McKean & Cudlip Detroit, Mich., of counsel, for Florists' Telegraph Delivery Ass'n.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

CASTLE, Circuit Judge.

This antitrust action was brought in the District Court by the plaintiff, Florists' Nationwide Telephone Delivery Network—America's Phone-Order Florists, Inc., (hereinafter FNTDN) against the defendant, Florists' Telegraph Delivery Association, (hereinafter FTD). Plaintiff FNTDN sought to recover treble damages, and an award of injunctive relief. In its second amended and supplemental complaint FNTDN alleged among other things, that defendant FTD and its members co-conspirators were engaged in a continuing combination and conspiracy to unreasonably restrain trade in and to monopolize or attempt to monopolize for FTD the business of providing flower wire order [1] services to retail florists, in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C.A. § §1, 2). It was alleged that the combination and conspiracy consisted of a continuing agreement, understanding and concert of action by FTD and its member co-conspirators to cause FTD members to cease and refrain from doing business with and from using the flowers-by-wire services of plaintiff FNTDN, in order to eliminate FNTDN as a competitor and to destroy its business. And that for the the purpose of carrying out the combination and conspiracy FTD adopted and promulgated membership rules, violation of which subjects the offending sub-

[1.] Orders for flowers accepted by a retail florist for delivery in another city or area, and which order is sent by such florist (by telephone, telegram or other communication) to a retail florist in the other city to be filled and delivered by the latter.

scribing florist to suspension or revocation of his FTD membership, which are designed and intended to prevent FTD members who are also subscribing florists of FNTDN from advertising their affiliation with FNTDN and to prevent such FTD members from permitting their names or shops to be listed in FNTDN's membership directory.

FTD's answer denied the allegations above referred to, and denied FTD's participation in any conspiracy or that it had otherwise violated the antitrust laws.

Plaintiff FNTDN filed a demand for a jury trial, and following such trial the jury returned a general verdict in favor of FNTDN and assessed its damages in the amount of $150,000. The District Court entered judgment on the verdict in the trebled amount of $450,000 together with costs and a reasonable attorney's fee. The court denied defendant FTD's motion for judgment in accordance with its motion for a directed verdict [2] or, in the alternative, for a new trial.

With respect to the claim for injunctive relief, the court, without further hearing, made and entered findings of fact and conclusions of law upon the basis of which it entered an order denying FNTDN's prayer for injunctive relief.

Plaintiff FNTDN appealed from the judgment order denying it injunctive relief. (Appeal No. 15719). Defendant FTD appealed from the money judgment against it. (Appeal No. 15720).

In its appeal from the money judgment against it FTD contends that the District Court refused to instruct the jury on FTD's theory of defense and thereby committed error requiring reversal, and that the evidence adduced to establish FNTDN's damages was too speculative and conjectural to sustain the verdict.

In FNTDN's appeal from the denial of injunctive relief against FTD it is contended by FNTDN that the trial judge was estopped by the jury's verdict from entering findings contrary to issues decided by the jury, and that having established a continuing antitrust violation FNTDN was entitled to an injunction as a matter of law.

The record discloses that FTD is the oldest and the leading organization of its kind in the United States. It was organized in 1910 as a voluntary association and later became a not-for-profit membership association incorporated under the laws of Michigan. FTD's membership includes the leading florists in each significant community in the United States. It has a membership of approximately 11,000 retail florists. There are about 22,000 such florists in the United States. FTD's principal function is the operation of a clearing house through which its members clear payment of flower orders exchanged between them, and which provides the mechanism that enables its members to accept, transmit and fill intercity orders—an order placed by a consumer in one city for the delivery of flowers in another city or community. The consumer's payment for such an order is received by a local FTD member florist who sends the order for execution to a fellow FTD florist of his own choosing in the destination city. The selection is made from the FTD membership list or directory. The consumer's florist accounts to FTD for the payment he receives. The destination florist fills the order from his own stock, in reliance upon the guaranty of the FTD clearing house that he will be paid. FTD is supported by annual membership dues, plus advances of 5% on orders handled for members by its clearing house. Such advances are used to defray clearing house costs and the expense of advertising and promotional activities performed by FTD on behalf of all of its members.

FNTDN was organized in 1958 and incorporated in 1959 as a Delaware corporation for profit. Its founder and president is Thomas O'Brien, an FTD member since 1939, and the owner-op-

2. Defendant's motion for a directed verdict at the close of the evidence was denied in part without prejudice, and the ruling on the balance was reserved.

erator of both retail and wholesale florist establishments in Chicago, Illinois. FNTDN offers its franchises, for which an annual fee is paid, to selected FTD members but its membership is limited to one FTD florist per city. FNTDN does not operate a flower order clearing house. Its members, being also FTD members, utilize FTD's clearing house for the clearance of flower orders exchanged between them. The principal services FNTDN provides its franchisee-members are the furnishing of a directory of its "selected" members, each of whom is represented to be the best, or one of the leading FTD florists, in the particular city in which he is located; dual listings in the "yellow pages" advertising section of telephone directories under each of FNTDN's compound names "Florists' Nationwide Telephone Delivery Network" and "America's Phone-Order Florists"; and the central purchasing of floral supplies at cost savings.

In 1961 FTD adopted two new rules which became effective July 17, 1961, and provided:

> "No Active Member shall permit the publication of his shop name as a part of any list or directory of FTD florists a purpose of which is to encourage or influence Active Members appearing on said list or in said directory to exchange orders between themselves to the exclusion of other Active Members of FTD."

and:

> "No Active Member shall advertise or hold out to the public in any manner with respect to flowers-by-wire orders that he offers an exclusive flowers-by-wire service, when other FTD members offer FTD service in the same area."

Subsequent to the publication of such rules FNTDN experienced a decline in its membership and an increase in the percentage of rejections in connection with franchises offered to prospective members. Within a period of eighteen months all but seven of FNTDN's members had either resigned from FNTDN or permitted their FNTDN franchises to lapse at the renewal dates.

The core of FTD's defense to both the damage claim and the claim for equitable (injunctive) relief is that the dominant purpose of FNTDN is centered in a scheme which involves misuse of FTD's clearing house facilities by those FTD members who are franchised by FNTDN to, in effect, boycott all other FTD members by exchanging intercity flower orders between themselves to the exclusion of other FTD members, and through such exclusive reciprocation obtain for each FNTDN member the major share of wire orders for the delivery of flowers in the city in which such member is the sole franchisee of FNTDN; that in furtherance of this purpose FNTDN advertises its franchisees as "exclusive representative" in such manner and context as is designed to deceive and mislead the public into believing that the FNTDN member is the only local florist offering "flowers-by-wire" service or is an FTD member preferred by FTD over its other members; that the FTD rules complained of are but reasonable methods of self-protection against such boycott and unfair and deceptive advertising practices on the part of FNTDN, are designed to preserve fair competition between FTD's own members and to safeguard the integrity of FTD's own services for the benefit of its members, and do not violate Section 1 or 2 of the Sherman Act or afford any basis for liability on the part of FTD for any losses sustained by FNTDN; and that FNTDN's purpose and conduct preclude it from recovery on its damage claim and bar it from equitable relief under the "clean hands" doctrine.

■ Such defense, if established, would so bar FNTDN from both recovery of damages and injunctive relief. Union Leader Corporation v. Newspapers of New England, Inc., 1 Cir., 284 F.2d 582, cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744, rehearing denied, 365 U.S. 890, 81 S.Ct. 1026, 6 L.Ed.2d 201; Cf. Crest Auto Supplies, Inc. v. Ero Manufacturing Company, 7 Cir., 360

F.2d 896, 900. In *Union Leader* it is pointed out (284 F.2d 582, 586–587):

> "To the extent that a party has merely sought to offset the other's illegal acts it has not acted with a wrongful intention, nor should its conduct result in public injury. In such a case there would be no reason to encourage recovery by the original offender, and every reason not to."

and the Court refers to the similar rationale reflected by the observation in Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 623, 73 S.Ct. 872, 888, 97 L.Ed. 1277, that:

> "[A]n unlawful trade practice may not be justified as an emulation of another's illegal plan. * * * But that factor is certainly relevant to illuminate ambiguous intent, particularly when planned injury to that other competitor is the crux of the charge."

Likewise, although factually distinguishable, Crest Auto Supplies exemplifies an application of the "clean hands" doctrine which is pertinent here. Both FNTDN's activities and FTD's challenged rules were concerned with the same transactions—the distribution and processing of intercity flowers-by-wire orders by FTD members via the FTD clearing house. Unlike the situation involved in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, and similar decisions relied upon by FNTDN, the "unclean hands" defense here asserted does not relate to a transaction or subject matter other than the one in suit. And, an association of business firms has the right to enact reasonable regulations governing trade practices of its member-competitors. Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683; White Motor Co. v. United States, 372 U.S. 253, 261, 83 S.Ct. 696, 9 L.Ed.2d 738. In *Board of Trade,* supra, it is stated:

> " 'Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.' "

FNTDN's reliance upon such cases as Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; and Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389, is misplaced. The classes of restraints there involved were on their face unduly restrictive in relation to the particular industry.

*Silver* involved an absolute, unqualified and unexplained ban on dealings with an outsider—a collective determination by the New York Stock Exchange, described by the Court as occurring "under totally unjustifiable circumstances" and as constituting "a *per se* violation of the Sherman Act" unless it was exempt from application of the antitrust laws—requiring a member house to terminate private wire service to a nonmember broker. In *Associated Press* the rule condemned empowered each member to block the application of any competing newspaper for membership. Thus, on its face, the rule constituted a restraint of trade which the Court characterized as "plainly designed in the interest of preventing competition." *Fashion Originators' Guild* involved a

combination of garment designers, garment manufacturers, and textile suppliers. The members boycotted and refused to sell their products to any retailer who sold garments copied from designs put out by the Guild members. It was held that the purpose and practice of the combination ran counter to the public policy declared in the Sherman and Clayton Acts. We perceive nothing in the case which impairs the validity of *Board of Trade,* supra.

Our examination of the record convinces us that it contains testimony and other evidence from which the jury reasonably could have concluded that the purpose and the activities of FNTDN were directed to effecting an exclusive exchange of intercity flower orders between the FNTDN members of FTD with the resulting boycott of other FTD members—an attempt to use FTD's own facilities to "skim the cream right smack off the top of all the intercity business in the country" [3] for the benefit of the one FNTDN franchisee in each city. And that FNTDN advertisements were designed to lead the readers to "assume right off the bat when they read our name that we are the organization," [4] and to mislead the public into believing the FNTDN member was the exclusive or preferred flower-by-wire florist in his city.

Indeed, the trial judge so appraised the record in his findings and conclusions which formed the basis for his denial of injunctive relief.[5]

The court gave the jury a general instruction to the effect that the rules complained of do not on their face constitute unreasonable restraints of trade but that if they were adopted and published with specific intent to destroy plaintiff's business such intent would convert the adoption and publication from lawful to unlawful acts, and that while trade associations may not adopt protective rules when the purpose or direct effect is to force competitors out of business, the antitrust laws do not prevent the adoption of reasonable rules and regulations

---

**3-4.** Statements contained in an explanation of FNTDN's program made by its president, Thomas O'Brien, in demonstrating what might be a typical sales approach to a prospect for an FNTDN franchise.

**5.** The trial judge found and concluded, *inter alia*:

"* * * Further, Plaintiff [FNTDN] utilized yellow page advertising listings which I find would be mistaken by the public as being designations by Defendant Association [FTD] of one or more of its members preferred by it over the other of its members in particular cities or areas."

"The avowed purposes of [FNTDN] in setting up and developing its business were: (a) to make profits from franchise costs and affiliation fees; (b) to provide those retail florists buying its franchises with a procedure whereby they could obtain from members of [FTD] a larger share of the flower-by-wire business in their respective areas or cities than would be obtained by other members of [FTD] in those areas or cities; and (c) to cause the general public to believe that in dealing with [FNTDN's] affiliates they were dealing with members of

[FTD] whom [FTD] preferred over its other members."

\* \* \* \* \* \*

"The activities of [FNTDN] constituted a procedure which, in effect, was a boycott against the members of [FTD] who were not affiliates of [FNTDN], and as such were against public policy."

"The activities of [FNTDN] were in part the utilization of fraudulent representations and deceit, and the sale of its services was made possible by such fraudulent representations and deceit, and as such its activities were against public policy."

\* \* \* \* \* \*

The trial judge further found and concluded that FTD members are free to join and many have joined competing flower-by-wire services without loss of membership in FTD, and that although the rules adopted by FTD relating to the conduct of its members were directed at the policies of FNTDN, they were not such a restraint upon FNTDN's activities as to justify injunctive relief, but rather were measures designed in good faith to preserve and promote fair competition in the industry, while protecting the integrity of FTD's own service for the benefit of its own members.

to protect against destructive and injurious practices of competitors when the purpose is to promote competition upon a sound basis. But the court refused to give instructions tendered by FTD which set forth the defense theories that FNTDN was engaged in a boycott of other FTD members; that FNTDN was deceptively advertising its members as exclusive wire order florists and preferred FTD members; and that FTD's intent in adopting the rules in issue was not to destroy FNTDN's business, but to protect FTD's members against FNTDN's boycott and deceptive activities. The court gave no instruction specifically setting forth or relating to FTD's theory of defense although as hereinbefore pointed out there was testimony and other evidence to support it.

■ A party is entitled to instructions presenting his theory of the case if there is evidence to support it. Allers v. Bohmker, 7 Cir., 199 F.2d 790. And this right is not satisfied by a general instruction as distinguished from specific instructions on the theory of defense which cover or relate to the various elements of that theory for which there is record evidentiary support. Chicago & North Western Railway Company v. Rieger, 8 Cir., 326 F.2d 329, 336. And even where the requested instruction is not entirely perfect there are situations where the court is not relieved of its duty to give the substance of the requested instruction where it appears that an instruction on the issue is needful to enable the jury to intelligently determine the question. Rieger, supra, 326 F.2d 329, 334 and 336. This would appear to be particularly so in the instant case where in contrast to the court's silence on the defendant's theory of defense it did give instructions which had the effect of fully covering the plaintiff's theory of liability and read pertinent extracts from the plaintiff's complaint to the jury, and although the court prefaced or interspersed them with the characterization "it is alleged" or "it is charged" it

gave no admonition that these allegations were mere accusations, not evidence.

■ On the damage claim phase of the appeals we conclude that, on the facts and circumstances here presented, the court's refusal and failure to instruct the jury on FTD's theory of defense constitutes prejudicial error which requires reversal of the judgment for damages and a remand to the District Court for a new trial.

In this connection we have considered FTD's contention that the evidence with respect to FNTDN's damages was too speculative and conjectural to furnish a sound basis for the amount allowed. We disagree. The principles recognized in Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–266, 66 S.Ct. 574, 90 L.Ed. 652; A. C. Becken Co. v. Gemex Corporation, 7 Cir., 272 F.2d 1; and Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 190 F.2d 561, would, if the judgment could otherwise stand, preclude us from disturbing it insofar as the contentions advanced with respect to the amount of damages awarded and the basis therefor are concerned. We make this observation only because of the remandment for a new trial.

We turn to consideration of the issue raised in connection with the District Court's denial of injunctive relief. FNTDN contends that the trial judge was estopped from entering findings contrary to issues decided by the jury's verdict, and that having established a continuing antitrust violation FNTDN was entitled to an injunction as a matter of law.

■ FNTDN's complaint combined claims for damages and injunctive relief. In such case a trial of either claim before the other raises a collateral estoppel to the relitigation of those issues essential to the decision which are common to both claims and are decided in connection with the claim tried first. United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36; [6] Perry-

6. Under the facts presented in *Munsingwear* the bar to relitigation of the common issue was characterized as falling

"squarely within the classic statement of the rule of *res judicata.*" 340 U.S. 38, 71 S.Ct. 105.

ton Wholesale, Inc. v. Pioneer Distributing Company of Kansas, 10 Cir., 353 F.2d 618, 623; Cf. Local 167, I. B. T. v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804. This principle was recognized in Bigelow v. RKO Radio Pictures, Inc., 7 Cir., 162 F.2d 520, 522–523, although it was not there relied upon. In *Bigelow* the trial court's findings upon which the grant of injunctive relief was predicated were supported by the evidence earlier submitted on the damages claim and were neither contrary to nor inconsistent with the earlier determination of the defendants' violation of Sections 1 and 2 of the Sherman Act implicit in the general verdict returned by the jury on the treble damages claim.

FNTDN having demanded a jury trial it was mandatory that the treble damages claim be tried and disposed of before consideration of the equitable claim for injunctive relief. The issue of the alleged violation of the Sherman Act was common to both claims. And to proceed otherwise might, through operation "either by way of res judicata or collateral estoppel" deprive FNTDN of its right to a jury trial on its treble damages claim. Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988.

■ But, under the principles established by the decisions above cited, the doctrine of collateral estoppel operated to preclude the District Court from predicating a denial of injunctive relief on a finding with respect to any essential issue common to both claims which finding is contrary to or inconsistent with the jury's resolution and determination of that same issue as implicitly reflected in its general verdict for FNTDN on the damages claim.

■ Of course, considerations peculiar to the award of equitable relief [7] and which are not common to those presented by the treble damages claim remain within the sole province of the trial judge and are to be resolved by him on the basis of the record of the jury trial (Bigelow v. RKO Radio Pictures Inc., 7 Cir., 162 F.2d 520, 522–523), or, if they do not admit of resolution from the evidence adduced in connection with the damages claim, on such record as supplemented by such additional evidence as is adduced at a hearing for that purpose before the trial judge.

■ A consideration of the trial judge's findings and conclusions in the instant case discloses no factual or legal basis, supported by evidence, for the denial of injunctive relief on the premise of some independent equitable consideration not common to the issues involved in the damages claim, and as to these issues his findings are contrary to the determination the jury made on these same issues by its verdict. The trial judge, in effect, found for FTD on its theory of defense—the theory with respect to which he refused and failed to instruct the jury.

Thus, although our reversal and remand for a new trial voids the jury's verdict, and FTD is entitled to a new trial on the damages claim made against it, FNTDN, under the circumstances is entitled to a redetermination of its claim for injunctive relief subject, of course, to any estoppel which on retrial may flow from the jury's determination of the issues which are common to both claims.

In support of their basic contentions on appeal each of the parties advances certain subsidiary and peripheral contentions which we have given consideration but which, in view of the conclusions we have reached, we deem it unnecessary to discuss.[8]

---

7. Section 16 of the Clayton Act (15 U.S. C.A. § 26) authorizes injunctive relief in private antitrust cases only "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings * * *".

8. The motion of the United States for leave to file a memorandum *amicus curiae*, presented therewith, is granted. The memorandum has received our attention.

Each of the judgment orders of the District Court appealed from is reversed, and the cause is remanded to the District Court for a new trial.

Reversed and remanded for a new trial.