**GOLDLAWR, INCORPORATED**

v.

**Jacob J. SHUBERT et al.**

Civ. A. Nos. 21506, 22092.

United States District Court
E. D. Pennsylvania.

June 8, 1967.

Edwin P. Rome, Morris L. Weisberg, Philadelphia, Pa., of counsel, Ruth B. Rosenberg, Edward E. Cohen, Blank, Rudenko, Klaus & Rome, Philadelphia, Pa., of counsel, for plaintiff.

Charles A. Wolfe, Philadelphia, Pa., Hugh G. Moulton, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Gerald Schoenfeld, Bernard B. Jacobs, New York City, of counsel, for Select Theatres Corp., and others.

## OPINION

KRAFT, District Judge.

After a decade [1] of collateral proceedings, and virtually on the eve of trial, the defendants have moved for summary judgment in these antitrust actions, in which plaintiff charges the defendants with violations of §§ 1 and 2 of the Sherman Act [2] for the period 1933–1960 and claims damages allegedly suffered from 1950 to 1960.

For the *sole and limited* purpose of deciding these motions, the defendants admit that they have engaged in a combination in restraint of trade in the booking and presentation of legitimate theatre attractions throughout the United States and in the presentation of legitimate attractions in Philadelphia, Baltimore, Boston, Chicago, Cincinnati, Detroit, Los Angeles, New York, Pittsburgh and Washington, D. C.

For the same restricted purpose defendants admit, further, that they owned and operated the United Booking Office, Inc. (U.B.O.), the only theatrical book-

---

1. Civil Action 21,506 was instituted on October 17, 1956; Civil Action 22,092, which extended the damage period and added defendants was begun on February 18, 1957, and was supplemented by a supplemental complaint filed in October, 1960.

2. 15 U.S.C.A. §§ 1 and 2.

ing office in the United States, which enabled them to monopolize the booking and presentation of theatrical attractions throughout the country, and particularly, in Philadelphia; that such monopoly power was employed by them and specifically incorporated into their standard booking contract which read as follows:

"*WHEREAS the party of the first part controls the booking and playing of first-class theatrical attractions throughout the United States and Canada, and*

WHEREAS the party of the second part is desirous of securing the presentation of the attractions thus controlled by the party of the first part and is desirous of arranging with the party of the first part for the production of such and other plays at the said [name of theatre] in the city of [name of city].

* * * the party of the second part hereby retains and engages the services of the party of the first part for a period commencing on the        day of        , for the exclusive booking of legitimate attractions during the term of this agreement at the said        theatre in the city aforementioned, and the said party hereby irrevocably appoints the party of the first part the sole and exclusive booking agent of the        theatre in the city of        ." (emphasis ours; Vol. I p. 163 of Plaintiff's Pre-Trial Memorandum)

By reason of such agreements the defendants stultified all competition by non-affiliated theatre operators, who were unable to secure legitimate attractions from the defendants. It gave the defendants as well a coercive power over the affiliated theatres, since the contract did not restrict U.B.O. from booking other theatres in the geographical area where the affiliated theatre was located.

The defendants' coercion was not limited to operators of theatres alone. It was extended to producers, who were compelled to book their shows through U. B.O. In occasional instances in which an independent producer of a recognized "smash hit" undertook to compete with the defendants' monopoly, his challenge was defeated. When the producers of *Life With Father* and the *Merry Widow* attempted to arrange independent tours for their productions, their efforts failed because of the pressure exerted by the defendants on theatre operators with whom the producers negotiated. Eventually, the producer of *Life With Father* capitulated to the Shuberts' position of strength and agreed to book his show through U.B.O. on September 1, 1942. (Vol. I Plaintiff's Pre-Trial Memorandum p. 143).

The *Merry Widow*, in 1944, arranged a booking in Detroit, Michigan only to find itself in competition with a Shubert-produced *Merry Widow* which had been deliberately booked there one week before the run of the established hit. Confusion reigned. Theatregoers frequently presented tickets at the wrong theatre, unaware that the *Merry Widow* was playing, competitively and concurrently, at two theatres. Thereafter, the producers of the "hit show" were unable, on a 12 week road tour, to book their attraction into a single Shubert affiliated theatre. (Vol. I Plaintiff's Pre-Trial Memorandum p. 147).

The defendants urge that, assuming the truth of the plaintiff's allegations for the purposes of the present motion— the plaintiff is not entitled to damages, because it was *in pari delicto* with the defendants and participated in the violations of §§ 1 and 2 of the Sherman Act. Crest Auto Supplies, Inc. v. Ero Manufacturing Company, 360 F.2d 896 (7 Cir. 1966).

The defendants claim to be entitled to judgment as a matter of law, asserting that the plaintiff corporation was formed in 1950 by William Goldman (Goldman) and Lawrence Shubert Lawrence, pursuant to an agreement among Goldman and the defendants in violation of the Sherman Act §§ 1 and 2 in which the parties agreed:

"(a) That plaintiff and defendants would allocate and divide among

themselves the legitimate attractions to be presented in Philadelphia."

"(b) That the defendants would exercise their alleged monopoly power to compel producers whose attractions had been allocated to plaintiff to present their attractions at plaintiff's theatre."

"(c) That the defendants would not compete with plaintiff in the solicitation of producers whose legitimate attractions had been allocated to plaintiff's theatre."

"(d) That the defendants would refuse to deal with any producer whose attraction had been allocated to plaintiff."

"(e) That plaintiff and defendants would pool and monopolize all five Philadelphia theatres and divide the profits of the Erlanger Theatre between Goldman and defendants."

The defendants contend that no genuine issue of material facts exists because they "adduce no evidentiary matter in their own behalf * * * [and] * * * rely solely upon the allegations of the Amended Compaint, plaintiff's answers to defendants' interrogatories, Plaintiff's Pre-Trial Memorandum and the deposition of plaintiff by its officers and directors, William Goldman [1763 pages], William A. Loudermilk and H. Norman Weiss including the exhibits thereto."

The plaintiff, in opposing the motion, offers the entire deposition of Goldman, an affidavit by Goldman and the pleadings.

██ " * * * [s]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Poller v. Columbia Broadcasting System, Inc. et al., 368 U. S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed. 2d 458 (1961). "Both factual inferences and the record as a whole must be viewed in the light most favorable to the party opposing summary judgment." 6 Moore's Fed.Prac. ¶ 56.17 [5] p. 2495 (2d ed. 1965).

From 1940 to 1950, William Goldman Theatres, Inc. attempted unsuccessfully to operate the Erlanger theatre, under a ten year lease, as Philadelphia's only independent legitimate theatre and as a first run motion picture house. It was unable to exhibit first run films in the Erlanger as the result of a conspiracy among the major motion picture distributors. William Goldman Theatres v. Loew's, Inc., 150 F.2d 738 (3 Cir. 1945).[3]

Only fifteen legitimate attractions,[4] including five Mask & Wig Club productions, were presented throughout this period. During Goldman's tenure the Shubert interests were negotiating with the landlord to take over the operation of the Erlanger. In 1949 Goldman learned of the Shubert negotiations, when he encountered Lawrence Shubert Lawrence on a Philadelphia street.

At this meeting, Lawrence, a nephew of Lee Shubert, approached Goldman with a proposal that he (Lawrence) and Goldman form a new corporation to operate the Erlanger as a legitimate theatre. Goldman, foreseeing an opportunity to obtain legitimate attractions, agreed with Lawrence to form Goldlawr, Inc. Upon incorporation Goldman and Lawrence owned equal shares of the issued stock and shared the responsibilities of corporate operation. Lawrence was to serve as general manager in charge of bookings and Goldman was to have charge of the management of the theatre.

On August 19, 1950, the plaintiff and Lee Shubert entered into a written agreement by the terms of which Lee Shubert agreed to supply Goldlawr with at least

---

3. Other proceedings reported in 54 F. Supp. 1011 (E.D.Pa. 1944) ; 69 F.Supp. 103, 109 (E.D.Pa.1946) ; review denied 163 F.2d 241 (3 Cir. 1947) ; aff'd 164 F.2d 1021 (3 Cir. 1948) ; cert. denied 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1948).

4. None of these were booked through U.B.O.

thirteen legitimate theatrical attractions to be performed at the Erlanger for a minimum of thirteen weeks during each year of a new ten year lease eventually obtained by Goldlawr from the lessor[5] of the theatre on September 19, 1950. The 1950 agreement also provided for the payment by Shubert to Goldlawr of $1000 as liquidated damages for each week that such attractions were not so provided.

Under this written agreement, *which the defendants concede to be completely proper and lawful,* Goldlawr began to operate the Erlanger in 1950. (Defendants' Brief p. 36). However, the defendants contend, that Goldlawr was also to receive "equal treatment" with the Shubert theatres in Philadelphia, pursuant to an independent illegal *understanding* Goldman had with Lee Shubert (Goldman Dep. 676–678). The defendants interpret that "equal treatment" to mean: (1) Goldlawr was to benefit from the exercise of the defendants coercive power upon the producers; (2) Goldlawr was to obtain productions from U.B.O. without engaging in competition with the defendants; (3) Goldlawr was specifically formed to accomplish an equal division of the product theretofore controlled by the defendants. Defendants urge that Goldlawr's ultimate acceptance of such benefits under the agreement bars any recovery by it under the doctrine of *in pari delicto.*

We think that several fundamental, pivotal facts are overlooked by the defendants in advancing their conclusion. It is deemed admitted, for purposes of this motion, that: (1) the defendants' booking office, U.B.O., was the *only* booking office in the United States; (2) it controlled the booking and playing of first class attractions throughout the United States; (3) no independent source existed to supply theatrical attractions sufficiently to encourage any

*meaningful* competition with the defendants; (4) defendants had so systematically blocked operators of independent theatres from procurement of attractions as virtually to compel cessation of their businesses.

It is settled law that where materials offered in support of a motion for summary judgment present a "choice of inferences to be drawn from the subsidiary facts contained in the affidavits, attached exhibits, and depositions * * *", such inferences "* * * drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

A fair reading of Goldman's deposition and affidavit gives rise to the reasonable inference that Goldlawr could not operate the Erlanger successfully, as a legitimate theatre, if it was unable to secure regular bookings from defendants' monopoly. When a plaintiff is unable to "* * * purchase or secure the goods necessary in the conduct of its business" except from the monopoly a "jury could justly reach the conclusion that the plaintiff was not a party to the alleged monopoly, and therefore was not in pari delicto with the defendant." Eastman Kodak Co. of New York v. Southern Photo Material Co., 295 F. 98, 102 (5 Cir. 1923) aff'd 273 U.S. 359, 377, 47 S. Ct. 400, 71 L.Ed. 684 (1927).

Under facts admitted for the purposes of this motion, viewed in the light most favorable to the plaintiff, the defendants had, by 1950, effectively eliminated competition for theatrical attractions in Philadelphia; the plaintiff, to insure survival, had to obtain bookings from the defendants. The fact that Goldlawr entered into an agreement with the defendants in the expectation that it

---

5. Lessor was then the Pennsylvania Company for Banking and Trusts, now First Pennsylvania Banking and Trust Company. The Bank conditioned its grant of a ten year lease to Goldlawr upon the assurance that Lee Shubert would guarantee at least thirteen weeks of theatrical attractions annually for the Erlanger. (Ex. D Agreement of August 15, 1950, Goldman Affidavit).

would receive the same number of bookings as one or more of the defendants' theatres does not necessarily make the plaintiff a party to the conspiracy.

▮ In the present context, consideration of the *in pari delicto* defense requires that proper weight be given to the dominant purpose of the antitrust laws; namely, to vindicate the public interest in free and open competition. Trebuhs Realty Co. v. News Syndicate Co., 107 F.Supp. 595, 598 (S.D.N.Y. 1952). "Public policy requires the exposure of antitrust violations even though an undeserving person benefits from the lawsuit." Affiliated Music Enterprises v. Sesac, Inc., 17 F.R.D. 509 (S.D.N.Y.1955).

The defendants' brief draws the following distinction between the defenses of *in pari delicto* and unclean hands:

"The doctrine of pari delicto is not to be *confused* with the defense of unclean hands, which the Supreme Court has ruled to be of limited application in suits under the antitrust laws. See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211 [71 S.Ct. 259, 95 L.Ed. 219] (1951); Moore v. Mead's Fine Bread Co., 348 U.S. 115 [75 S.Ct. 148, 99 L.Ed. 145] (1954). In these cases the defendant sought to bar recovery because plaintiff had participated in wrongdoing under the antitrust laws unrelated to that charged in the complaint. These decisions have not limited application of the pari delicto doctrine. See Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co., 209 F.2d 131 (4th Cir. 1953), cert. den. 247 [347] U.S. 360 [960, 74 S.Ct. 709, 98 L.Ed. 1104] (1954); Crest Auto Supplies, Inc. v. Ero Manufacturing Co., 360 F.2d 896 (7th Cir. 1966)." (emphasis ours.)

Some confusion appears to exist, however, since other courts have used the principles of the two defenses interchangeably. Trebuhs Realty Co. v. News

Syndicate Co., supra; Fanchon & Marco v. Paramount Pictures, 100 F.Supp. 84, 93 (S.D.Cal.1951). We note that, in Moore v. Mead Service Co., 184 F.2d 338, 340 (10 Cir. 1950), the Court of Appeals affirmed judgment for the defendant on the *specific* ground that the plaintiff was a participant in the illegal activity.

"This is not so much the application of the equitable doctrine of 'unclean hands' as it is a holding that the plaintiff was actually in pari delicto."

The Supreme Court reversed the Circuit Court in *Moore, per curiam,* 340 U.S. 944, 71 S.Ct. 528, 95 L.Ed. 681, and remanded the case " * * * to that court for further consideration in light of Kiefer-Stewart Co. v. Joseph E. Seagram & Sons. [340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951)]." Ultimately, the plaintiff in *Moore* prevailed. [348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954)].

Moreover, the Court of Appeals for the Seventh Circuit, which, had applied, in Crest Auto Supplies, Inc., supra, the *in pari delicto* principle, referred, in Florists' Nationwide Tel. Del. Net. v. Florists' Tel. Del. Ass'n, 7 Cir., 371 F.2d 263, 268,[6] to *Crest* as follows: "Likewise, although factually distinguishable, Crest Auto Supplies exemplifies an application of the 'clean hands' doctrine which is pertinent here. Both FNTDN's activities and FTD's challenged rules *were concerned with the same transactions * * *".

▮ Whatever label may be properly affixed to the defense, it has been upheld when the plaintiff has participated *freely* in the very scheme for which he seeks to recover damages. Eastman Kodak Co. v. Blackmore, 277 F. 694 (2 Cir. 1921); Bluefield S.S. Co. v. United Fruit Co., 243 F. 1 (3 Cir. 1917). However, where one party to an illegal contract acts under *economic duress*, as Goldlawr here claims, its participation has been held not to preclude a right of action. Eastman Kodak Co. of New York v.

6. Petition for certiorari, 387 U.S. 909, 87 S.Ct. 1686, 18 L.Ed.2d 627, was denied on May 15, 1967.

Southern Photo Materials Co., supra. In our view Goldlawr's claim of economic duress presents an issue of fact which, of itself, prevents summary judgment. H. & A. Selmer Inc. v. Musical Instrument Exchange, 154 F.Supp. 697, 698. (S.D.N.Y.1957).

We find unpersuasive defendants' argument that no coercion existed because Goldman was not restricted by the agreement and was free to solicit producers, as he had done before the agreement was made. Such a "freedom" to solicit was virtually meaningless in view of the defendants' domination over producers, bookings and theatres. The defendants had created an oppressive, non-competitive atmosphere in the legitimate theatre field, which made it practically impossible for plaintiff to attain its business objective of profitable operation.

■ We perceive no merit in the defendants' alternative motion, that Goldlawr lacks standing o sue for the period September 1, 1950 through June 1956. It is argued that, since he owned 50% of the stock, Lawrence would never have agreed to compete with his uncles; that, in consequence, a majority vote of plaintiff's board of directors, necessary to authorize such action, could never have been obtained; that, since the plaintiff had not formed the intention to compete with defendants, it has no standing to sue.

Monopolists, who have suppressed all competition, should not be permitted, by summary judgment, to deprive a suitor, in these circumstances, of opportunity for trial and determination of the issue of the suitor's competitive intention. This is particularly so in this case in which it is represented that evidence exists to prove that Lawrence had connived with his uncles to keep the Erlanger out of competition with the Shuberts. (Goldman Deposition pp. 574–576).

We are constrained to deny as well the defendants' alternative motion for leave to assert a "contingent" counterclaim, by amending their answers pursuant to rules 15(a) and (d). In substance, the proposed counterclaim, which is in two counts, alleges fraud under Section 10 of the Securities Exchange Act of 1934, and Rules 10(b) 5(1) (2) and (3) of the Securities and Exchange Commission and avers that Goldman misled Lawrence when the latter sold his Goldlawr stock to Goldman. Count II alleges common-law fraud.

The fraud on Lawrence is alleged to be Goldman's non-disclosure, prior to his acquisition of Lawrence's stock, of his intention to cause these actions to be instituted; that Lawrence would otherwise have retained his stock and *could* have transferred it to Goldman at a price which would have reflected the potential value of any recovery; that, as a result *if* a recovery is had, Lawrence's Estate is entitled to half.

■ The defendants describe their "contingent" counterclaim as akin to a claim for indemnity or contribution. The defendants' claim is not now matured and, so, does not qualify as a counterclaim under Rule 13(a). The language of Rule 13 is explicit and requires the claim to exist " * * * at the time of serving the pleading * * *." Slavics v. Wood, 36 F.R.D. 47 (E.D.Pa. 1964); Allstate Insurance Co. v. Valdez, 29 F.R.D. 479, 481 (E.D.Mich.1962).

■ Another defect, fatal to the defendants' claim, is that Rule 13(f), not Rules 15(a) and (d), governs omitted counterclaims. By attempting to amend their answer under Rule 15 defendants obviously seek to avoid the bar of the statute of limitations. However, "the remedies provided by the two rules are mutually exclusive in the sense that an amendment asserting a previously omitted counterclaim, such as was attempted in the instant case, is made pursuant to Rule 13(f) and not Rule 15(a)." Stoner v. Terranella, 372 F.2d 89 (6 Cir. 1967). Moreover, even assuming the counterclaim to be well pleaded, we do not find, in this ten-year old record, such excusable neglect, inadvertence or oversight as would justify a grant of the motion.